## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**MICHAEL DAVIS**                                    **CIVIL ACTION**

**VERSUS**                                              **NO.  16-952**

**N. BURL CAIN, WARDEN**                        **SECTION "N"(2)**

### REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary.  See 28 U.S.C. § 2254(e)(2).[1]  For the following reasons, I recommend that the instant petition for habeas corpus relief be **DENIED** and **DISMISSED WITH PREJUDICE**.

---

[1]Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination.  Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

## I.    STATE COURT PROCEDURAL BACKGROUND

The petitioner, Michael Davis, is incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[2] On October 10, 2002, Davis was charged in Orleans Parish, along with Dwight Patterson, Willie Wilbon and Bradley Armstrong, with first degree murder in violation of La. Rev. Stat. §14.30.[3] On February 21, 2003, Davis's counsel filed a motion to suppress his confession.[4] On March 28, 2003, the state trial court held an evidentiary hearing as to various defense motions including the motion to suppress.[5] The state trial court denied the suppression motion.[6]

On February 22 or 23, 2005, Davis and Armstrong were charged by bill of information in Orleans Parish with four counts of armed robbery in violation of La. Rev. Stat. § 14:64.[7] On March 9, 2005, the State entered a nolle prosequi as to the first degree murder charge.[8] Davis's counsel was permitted to withdraw on August 22, 2005.[9] New counsel was appointed to represent Davis on July 24, 2006.[10] Davis's new counsel filed

---

[2]Rec. Doc. No. 5.

[3]St. Rec. Vol. 1 of 11, 433-891 Docket Master, 10/10/02.

[4]St. Rec. Vol. 1 of 11, 433-891 Docket Master, 2/21/03.

[5]St. Rec. Vol. 4 of 11, Transcript, 3/28/03.

[6]St. Rec. Vol. 4 of 11, Transcript, p. 150, 3/28/03.

[7]St. Rec. Vol. 1 of 11, Bill of Information, 2/22/05.

[8]St. Rec. Vol. 1 of 11, 433-891 Docket Master, 3/9/05.

[9]St. Rec. Vol. 1 of 11, Docket Master, 8/22/05; St. Rec. Vol. 6 of 11, Motion to Withdraw, 8/22/05.

[10]St. Rec. Vol. 1 of 11, Docket Master, 7/24/06.

another motion to suppress the confession.[11]  The state trial court denied the motion.[12]

The Louisiana Fourth Circuit Court of Appeal summarized the facts determined at trial

as follows in relevant part:

>    Davis was charged with and convicted of three counts of armed robbery, committed inside the Club Tango bar in New Orleans on 4 August 2002.  As the robbers were escaping the bar, one of them - not defendant herein - fired a handgun at two police officers, fatally striking Officer Christopher Russell.
>
>    Annie Florence Lockett, a supervisor in the NOPD 911 call center, identified an incident sheet from an 4 August 4, 2002 911 call and an audiotape of the call; the audiotape was played for the jury.
>
>    Oletha Washington testified that she was in the Club Tango, located at the corner of Spain and North Roman Streets in New Orleans, in the early morning hours of 4 August 2002.  She was playing a video poker machine in the rear of the bar at approximately 3:00 a.m. when she heard a commotion and someone say:  "You think this is a joke.  This is armed robbery."  Ms. Washington looked out and saw a gunman wearing a light T-shirt who had a "big" silver gun in his hand.  There was more than one armed robber.  She hid behind a video poker machine and dialed 911 on her cell phone.  Ms. Washington stated on cross examination that she did not see the defendant come into the bar that morning.  She did not hear his voice and did not know his voice.  Davis did not take anything from her that morning.  She estimated that fifteen to twenty people were in the bar at the time.  There was no back door to the bar of which she was aware.
>
>    NOPD K-9 Sergeant Rickey Blanchard searched the area around the Club Tango on 4 August 2002 after the robbery.  The officer's canine found Davis hiding in some bushes in front of 1840 St. Roch Street, around the corner from the bar.  A semi-automatic handgun was found where he was hiding, as well as some currency and some jewelry.  Sergeant Blanchard identified the photos of the scene where Davis was found hiding.  The sergeant searched for the two other suspects without success.
>
>    Sergeant Blanchard stated on cross examination that he made a use-of-force report in connection with the apprehension of Davis, because his canine bit the defendant.  The officer said he would have been told if the other officers who actually secured Davis had any weapons on his person, and that he recalled only the weapon in the shrubbery being recovered.  He said Davis was less than an arm's length from the gun - basically on top of it.

---

[11]St. Rec. Vol. 8 of 11, Motion to Suppress, 2/15/08.

[12]St. Rec. Vol. 4 of 11, Transcript, p. 22, 2/28/08.

Ronnie Cravens testified that he was in the men's room at Club Tango when the robbery began. A gunman came to the rest room, ordered him out, ordered him to take off his clothes, put the clothes in a trash bag that the robber was holding, and go back into the restroom and lie on the floor. Approximately $100 was missing from his shirt pocket when he retrieved his clothes from the bag after the robbery. Seven or eight other customers were forced to lie in the restroom with him. He stated that he could not clearly see the person with the gun. He replied in the negative when asked on cross examination whether he had seen the defendant in the bar that night. He could not say who took his money. He did not see anyone else in the bar with a weapon that night besides the person who confronted him at the door of the restroom.

Joseph Frederichs was near the front door of the Club Tango when three or four men with weapons came in and announced a robbery. He and other customers were ordered to empty their pockets and put the items in a bag, to take off their clothes, put the clothes into garbage bags, and to go into the restroom. Frederichs could not describe or identify any of the robbers. He was told not to look at them. Approximately $360.00 was stolen from him.

Peggy Pritchard tended bar at the Club Tango, which was owned by her sister, brother, and her sister's husband. She testified that she buzzed Billy/Willie Wilbon, a longtime friend of her sister's and her sister's family, into the bar at approximately 3:00 a.m. on the morning of the robbery. He ordered and received a beer, and stayed for about ten minutes before asking her to buzz him out. Mr. Wilbon opened the door very wide to exit, allowing three men with guns drawn to come inside. She described the three individuals in terms of height, clothing, and skin color/tone. Ms. Pritchard described the bar lighting and replied in the affirmative when asked whether she was able to the see the perpetrators' faces. The robbers made everyone get on the floor, demanded money and jewelry, and then ordered them to take off their clothes. One pointed a gun at her head and asked for money from the cash register, and she gave him that and other money that was kept behind the bar. She described that robber as five feet seven inches to five feet nine inches tall, with really dark skin and a low haircut.

Ms. Pritchard said another robber, whom she referred to as the "shooter," was brown-skinned, around five feet seven inches tall, weighing between 170 and 190 pounds. He kept threatening to shoot people. He told Mr. Pritchard to let them out, meaning unlock the door with the buzzer. She thought she noticed a blue light flashing. She buzzed open the door and the "shooter" exited and began shooting at a police car. The other two robbers in the bar frantically tried to get out. One climbed on the bar and tried to get in the ceiling and the other tried to get out of the window of the ladies restroom. Ms. Pritchard eventually buzzed them out of the front door.

Later that morning Ms. Pritchard was shown a photo lineup consisting of six photographs. She positively identified Davis in that lineup. She referred to him as robber number three. She was one hundred percent certain of her

identification.  She also identified the other two robbers.  Ms. Pritchard admitted on cross examination that in a prior statement to police she said could not really tell the officer what robber number three looked like, that she really did not get a good look at him, and about all she could say was that he was brown-skinned and was wearing dark clothes.  However, she maintained during cross examination that in fact she did get a good look at him.  She said she gave her clothes to Davis and saw him come in the door, but had not spent a lot of time with him.  She said she did not know why she told the officer interviewing her that she really did not get a good look at him.  She viewed the photo lineup in which she identified Davis right after giving the statement in which she said she really did not get a good look at him.

NOPD Officer Mary Colon testified that on 4 August 2002 she was with her field training officer, Officer Christopher Russell.  They received an armed robbery in progress call at approximately 3:20 a.m.  Subsequent information led them to believe it was only someone outside the bar asking people for money and drugs.  They drove slowly up Spain Street from North Claiborne Avenue.  They pulled up to the bar at the corner of North Roman and Spain Streets.  Officer Colon observed a black male walk out the front door of the bar.  He took three or four steps, stopped, looked at Officer Colon and Officer Russell, then pulled a gun from his side and started shooting.  She described the male as dark-skinned, approximately five feet nine or five feet ten inches tall, wearing a very large white shirt, with a short hair cut and no facial hair.  She estimated that he was in his late teens or early twenties.  The first bullet went through her window.  She did not know where the others went.

Officer Colon realized that Officer Russell's seat was empty and that his door was open.  She leaned over and saw Officer's Russell's feet on the ground and noticed that he was not moving.  She looked back over her right shoulder and saw a second individual come out of the bar, also holding a gun.  He was wearing either black or dark gray clothing and was approximately six feet tall, with a thin build and a short haircut.  He stopped behind the shooter, and then they both ran behind the building.  Officer Russell was taken to University Hospital.  While there, Officer Colon was leaving a restroom in the company of another officer, Officer Rose Houston, when she saw the second robber/gunman who had come out of the Club Tango that night.  She pointed at him saying, "That's him, that's him."  Officer Colon identified Davis in court as that same person.  Officer Colon also identified a number of photographs of the crime scene.

Officer Colon said the shooter was twelve to fifteen feet away when he shot at her and Officer Russell.  She said Davis had something shiny in his right hand when he came out of the bar that she assumed was a gun.  She did not recall seeing any money or jewelry in his hand.  When she saw Davis again in the hospital he had two police officers walking behind him.

Former NOPD Officer and Crime Scene Technician Millard Green processed what he recalled were three or four crime scenes in connection with the

armed robbery at the Club Tango on 4 August 2002.  He identified his forty-five page report and referred to it several times to refresh his memory. Mr. Green said that he recovered a Larson L38 semi-automatic handgun, serial number 402693, with a magazine containing five live .380 caliber cartridges; a black stocking cap; a number of other items (such as key rings, a ring, a yellow metal bracelet and a yellow metal Citizen brand watch); a blood sample from the sidewalk; approximately $65.00 in mixed denominations; and some gold dental caps, all in front of 1845 St. Roch Street.  He also photographed the scene, taking photos of, inter alia, several key rings in the bushes that were a foot or two from the handgun; some trampled flowers in that area; and blood on the sidewalk.  A chrome-plated Smith & Wesson .357 Magnum caliber revolver, serial number EEV5088, was recovered from the roof of the garage at 1818 St. Roch Street.  A Nokia cell phone was recovered in an alley at that location.

Former NOPD Homicide Detective Marco Demma, Jr. investigated the armed robbery of the Club Tango and the murder of Officer Russell.  A bullet hole was present in the ceiling of the bar, and it was determined that one of the robbers had discharged a .380 caliber firearm while attempting to push open one of the seal tabs on the ceiling and escape from police.  A .380 Larson semiautomatic handgun was found partially buried in the dirt in a garden at 1840 St. Roch Street, and it was in close proximity to numerous personal articles such as jewelry, a ring, and several gold dental fillings.  The detective identified the Larson .380 handgun.  Davis was apprehended before Detective Demma arrived on the scene.  Davis was transported by police to the hospital to be treated for dog bites.

Detective Demma said Davis was then transported to the homicide office where he and Detective Dwight Deal read him his rights and asked him if he wanted to give a statement.  Detective Demma identified a rights-of-arrestee form that Davis signed, waiving his rights.  Davis briefly explained his involvement and that of Willie Wilbon, Dwight Patterson, and another individual he knew as "Slim D."  He later gave a formal statement that was recorded. Detective Demma was there when that statement  began, but left at some point, and Detective Deal continued to take the statement without him. He had no further participation in the investigation insofar as Davis was concerned.

Detective Demma testified on cross examination that the rights-of-arrestee form was signed by defendant at 11 a.m. on 4 August 2002.  Detective Deal prepared the form, but Detective Demma witnessed Davis sign it.  Detective Deal asked the defendant if he could read and write, and Detective Demma believed Davis indicated he could.  Davis then indicated to Detective Deal that he wanted to give a voluntary statement.  Detective Demma believed Davis had some bandages on his arms from the dog bites, but not on his face, and he said that other than the dog bites Davis was in good condition.  He replied in the affirmative when asked whether Davis would have given the recorded statement at around 5:20 p.m. on 4 August 2002, approximately fifteen hours after he had

been arrested.  (Detective Demma said Davis was at the hospital for seven or eight hours.)  The detective did not know whether Davis received any medication at the hospital, and he did not ask him if he had.  The defendant was not allowed to use the telephone; he was allowed to have something to drink and use the restroom.  He was not beaten at police headquarters.  He was handcuffed in front throughout the six or seven hours that he was in the homicide office.  Detective Demma had no reports indicating that items found in the bushes at 1840 St. Roch Street had been checked for fingerprints.

NOPD Lieutenant Michael Field testified that he was at the hospital when Officer Russell was brought in on 4 August 2002.  After Officer Russell was pronounced dead, he was put in charge of securing Davis at the hospital until he was transported to the homicide division.  He and Detective Barrett Martin were the only two officers with the defendant at the hospital. Davis was placed in a police car and taken to police headquarters, followed by Lieutenant Field in his unit.  Once he turned the defendant over to homicide officers, his assignment was completed.

NOPD Sergeant James Anderson testified that he was with the homicide division on 4 August 2002 and was the lead investigator in the murder of Officer Russell.  He showed Club Tango bartender Peggy Pritchard a photo lineup at 7:07 a.m. that day.  She immediately identified a photo of Davis, without any suggestion, force, or coercion.

NOPD Officer Winston Harbin, Jr. was called to the scene of the 4 August 2002 robbery/murder at the Club Tango as a homicide detective.  He logged into the evidence room a number of recordings, including one of the defendant's confession/statement.

Orleans Parish Criminal District Court evidence and property clerk Kenneth Brown was one of the custodians of evidence stored at the court.  He testified that the office had logged in a videotape of Davis' statement, but that it had been lost/destroyed in chest-high flood waters that inundated the evidence room in the aftermath of Hurricane Katrina.  Mr. Brown identified the original and a photocopy of the evidence log showing the entry.

Former NOPD Homicide Detective Dwight Deal testified that he was recovering from back surgery on 4 August 2002, and had been out of work since May.  He was called in on the case because of his expertise in interview and interrogation.  His commander told him that the police had suspects in Officer Russell's murder, but that they were not talking.  The commander told Detective Deal they needed someone to come in and talk to, interview, and interrogate the suspects.  Detective Deal thought he first began interviewing Davis close to 4:00 p.m.  He advised Davis of his rights verbally and then by a rights-of-arrestee form.  Davis made Detective Deal appreciate that he understood his rights, that he understood them well, and that he wished to cooperate and speak with him. Davis signed the form. Detective Deal confirmed that Detective Demma was present when the rights-of-arrestee form was executed, and that Detective

Demma's name appeared on the form. Detective Deal also advised Davis of his rights prior to taking the recorded statement, which began after Davis gave an oral unrecorded statement. Detective Deal testified that Davis wanted to make it clear what his role in the robbery had been—and what it had not been. Detective Deal identified a copy of an audiotape of Davis' statement and a transcription of that statement. The audiotape was played for the jury.

Detective Deal testified on cross examination that he arrived at police headquarters between 9:00 and 9:30 a.m. on 4 August 2002, but had no contact with Davis until approximately 4 p.m. He understood the defendant had already been advised of his rights. The written waiver of rights form was executed after he arrived. Detective Deal testified that he absolutely asked Davis if he understood that he was signing the form to waive his rights before Davis signed the form. The formal audiotaped statement, which began about 5:20 p.m., reflects that he advised Davis of his rights. Detective Deal said he could not recall whether he or the defendant checked off the box indicating Davis understood that he was waiving his rights. Defense counsel questioned Detective Deal as to part of the formal recorded statement, as follows:

Q "And you have the right to have an attorney or an appointed attorney present at [sic] time of questioning, or giving any statement", and the answer by Mr. Davis:
A "Yes, sir. Well like, can I have a—which means something else, confession at this time."

The next question you asked Mr. Davis is

Q While you give our statement, do you want to give us a statement at this time concerning this matter?"

Defense counsel asked Detective Deal why he asked Davis the second question. He said he thought the defendant's answer was "inaudible [sic] to my question." He also mentioned that he thought Davis' voice was "fading out" at times. Detective Deal did not recall whether he provided the defendant with water, something to drink, or bathroom privileges while he was with him.

Detective Deal was asked on redirect examination whether he forced or coerced the defendant into giving a statement, and he replied: "Absolutely not." Asked if he promised Davis anything in exchange for his statement, he said: "Nothing whatsoever."

State v. Davis, 30 So.3d 201, 202-207 (La. App. 4th Cir. 2010); State Record Volume 10 of 11, Louisiana Fourth Circuit Court of Appeal Opinion, 2009-KA-0438, pages 2-12, January 13, 2010.

The first armed robbery count was dismissed by the State on May 12, 2008.[13] Davis was tried before a jury on May 12-14, 2008, and was found guilty as charged of counts two, three and four.[14]  On May 22, 2008, the state trial court sentenced Davis to consecutive terms of ninety-nine (99) years in prison on each count to be served at hard labor.[15]  On that same day, the State filed a multiple offender bill charging Davis as a fourth felony offender in connection with the armed robbery conviction on one of the counts.[16]  The state trial court found Davis a multiple offender and resentenced him on that count to life imprisonment at hard labor.[17]

On direct appeal to the Louisiana Fourth Circuit, Davis's appointed counsel asserted two errors:[18]  (1) The state trial court erred in allowing testimony concerning the murder of NOPD Officer Christopher Russell.  (2) The trial court erred in admitting

---

[13]St. Rec. Vol. 1 of 11, Minute Entry, 5/12/08.

[14] St. Rec. Vol. 1 of 11, Trial Minutes, 5/12/08; Trial Minutes, 5/13/08; Trial Minutes, 5/14/08; Jury Verdict, 5/14/08; St. Rec. Vol. 8 of 11, Trial Transcript, 5/12/08; Trial Transcript, 5/13/08; St. Rec. Vol. 9 of 11, Trial Transcript 5/14/08.

[15]St. Rec. Vol. 1 of 11, Sentencing Minutes, 5/22/08; St. Rec. Vol. 9 of 11, Sentencing Transcript, 5/22/08.

[16]St. Rec. Vol. 1 of 11, Multiple Bill, 5/22/08; Sentencing Minutes, 5/22/08; St. Rec. Vol. 9 of 11, Sentencing Transcript, 5/22/08.

[17]St. Rec. Vol. 1 of 11, Sentencing Minutes, 5/22/08.

[18]St. Rec. Vol. 10 of 11, Appeal Brief, 09-KA-438, 6/3/09.

evidence of Davis's confession because it was taken when he was injured, exhausted, and medicated; and he explicitly invoked his right to counsel.  On January 13, 2010, the Louisiana Fourth Circuit affirmed the convictions and sentences, finding the claims meritless.[19]

The Louisiana Supreme Court denied Davis's subsequent writ application without stated reasons on September 17, 2010.[20]  Davis's conviction became final when the United States Supreme Court denied Davis's petition for writ of certiorari on January 10, 2011.[21]  Geisberg v. Cockrell, 288 F.3d 268, 271 (5th Cir. 2002); Crutcher v. Cockrell, 301 F.3d 656, 657 (5th Cir. 2002); State v. Hofman,768 So.2d 592, 592 (La. 2000).

On September 17, 2011, Davis submitted an application to the state trial court for post-conviction relief, asserting the following grounds for relief:[22]  (1) Counsel was ineffective in failing to file a motion to quash based on expired statutory time limitations. (2) The record failed to include bench conferences at which the trial court denied counsel's peremptory challenges and challenges for cause.  The state trial court denied the application on May 6, 2013, finding the claims without merit and that Davis had failed to provide evidence to support his claims.[23]

---

[19] Davis, 30 So. 3d at 207-216; St. Rec. Vol 10 of 11, 4th Cir. Opinion, 2009-KA-0438, 1/13/10.

[20] State v. Davis, 45 So.3d 1041 (La. 2010) (Mem.); St. Rec. Vol. 10 of 11, La. S. Ct. Order, 2010-KO-0314, 9/17/10; La. S. Ct. Writ Application, 10-KO-314, 2/4/10.

[21] Davis v. Louisiana, 562 U.S. 1158 (2011) (Mem.).

[22] St. Record Vol. 11 of 11, Uniform Application for Post-Conviction Relief, 9/17/11 (dated 9/7/11).

[23] St. Rec. Vol. 1 of 11, Minute Entry, 5/6/13.

The Louisiana Fourth Circuit denied Davis's subsequent writ application without stated reasons on December 17, 2014.[24]  The Louisiana Supreme Court denied Davis's related writ application on November 6, 2015.[25]

## II.    FEDERAL HABEAS PETITION

On February 3, 2016, the clerk of this court filed Davis's petition for federal habeas corpus relief in which he asserts the following grounds for relief:[26]  (1) The state trial court erred in allowing evidence relating to the murder of Officer Russell at Davis's trial.  (2) The state trial court erred in admitting Davis's confession.  (3) Counsel was ineffective in failing to file a motion to quash based on the expiration of statutory limitations to institute the armed robbery charges and commence trial on those charges. (4) The record fails to reflect the peremptory challenges made by defense counsel with regard to the state trial court's denial of his challenges for cause.

The State filed an answer in response to Davis's petition in which it concedes that the federal petition is timely and that the claims were exhausted through available state court remedies.[27]  The State argues that the denial of relief by the state courts was not

---

[24]St. Rec. Vol. 11 of 11, 4th Cir. Order, 2014-K-1343, 12/17/14; 4th Cir. Writ Application, 2014-K-1343, 12/8/14.

[25]State ex rel. Davis v. State, 182 So.3d 32 (La. 2015) (Mem.); St. Rec. Vol. 11of 11, La. S. Ct. Order, 2015-KH-0138, 11/6/15; La. S. Ct. Writ Application, 15-KH-138, 1/21/15.

[26]Rec. Doc. No. 5.

[27]Rec. Doc. No. 12.

contrary to or an unreasonable application of federal law and that the claims are without merit.

## III.    GENERAL STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254.  The AEDPA went into effect on April 24, 1996[28] and applies to habeas petitions filed after that date.  Flanagan v. Johnson, 154 F.3d 196, 198 (5th Cir. 1998) (citing Lindh v. Murphy, 521 U.S. 320 (1997)).  The AEDPA therefore applies to Davis's petition, which, for reasons discussed below, is deemed filed in a federal court on February 1, 2016.[29]

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether petitioner's claims were adjudicated on the merits in

---

[28]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. United States v. Sherrod, 964 F.2d 1501, 1505 (5th Cir. 1992).

[29]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. Coleman v. Johnson, 184 F.3d 398, 401 (5th Cir. 1999), cert. denied, 529 U.S. 1057 (2000); Spotville v. Cain, 149 F.3d 374, 378 (5th Cir. 1998); Cooper v. Brookshire, 70 F.3d 377, 379 (5th Cir. 1995). The clerk of this court initially received and filed Davis's deficient petition on February 3, 2016, and docketed on March 8, 2016, after correction of certain deficiencies. The case ultimately was opened on April 7, 2016, when the clerk received the filing fee from Davis after denial of pauper status. Nevertheless, Davis dated the signature on his original petition on February 1, 2016, which is the earliest date appearing in the record on which he could have submitted his pleadings to prison officials for mailing to a federal court. The fact that he paid the filing fee does not alter the application of the federal mailbox rule to his pro se petition. Cousin v. Lensing, 310 F.3d 843, 847 (5th Cir. 2002).

state court; i.e., the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.  Nobles v. Johnson, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).  The State concedes and I find that Davis's petition was timely filed and that his claims are exhausted.  The record does not reflect that Davis's claims are in procedural default.

## IV.    STANDARDS OF MERIT REVIEW

28 U.S.C. §§ 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law in federal habeas corpus proceedings.  Nobles, 127 F.3d at 419-20 (citing 28 U.S.C. § 2254(b) and (c)).

Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2)), cert. denied, 532 U.S. 1039 (2001).  The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.  28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent.]'"  Penry v. Johnson, 215 F.3d 504, 507 (5th Cir.

2000) (quoting Miller v. Johnson, 200 F.3d 274, 280-81 (5th Cir.), cert. denied, 531 U.S.

849 (2000)), aff'd in part, rev'd in part on other grounds, 532 U.S. 782 (2001); Hill, 210

F.3d at 485.  The United States Supreme Court has clarified the Section 2254(d)(1)

standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ
> if the state court arrives at a conclusion opposite to that reached by this
> Court on a question of law or if the state court decides a case differently
> than this Court has on a set of materially indistinguishable facts.  Under the
> "unreasonable application" clause, a federal habeas court may grant the
> writ if the state court identifies the correct governing legal principle from
> this Court's decisions but unreasonably applies that principle to the facts
> of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 405-06, 412-13 (2000); Penry v. Johnson, 532 U.S.

782, 792-93 (2001);  Hill, 210 F.3d at 485.  The "critical point" in determining the

Supreme Court rule to be applied "is that relief is available under § 2254(d)(1)'s

unreasonable-application clause if, and only if, it is so obvious that a clearly established

rule applies to a given set of facts that there could be no 'fairminded disagreement' on

the question." (citation omitted)  White v. Woodall, __ U.S. __, 134 S. Ct. 1697, 1706-07

(2014) (citing Harrington, 562 U.S. at 103, and Knowles v. Mirzayance, 556 U.S. 111,

122 (2009)).  "Thus, 'if a habeas court must extend a rationale before it can apply to the

facts at hand,' then by definition the rationale was not 'clearly established at the time of

the state-court decision.'"  White, 134 S. Ct. at 1706 (quoting Yarborough v. Alvarado,

541 U.S. 652, 666 (2004)).

"'A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state court decision applied [a Supreme Court case] incorrectly.'" Price v. Vincent, 538 U.S. 634, 641 (2003) (quoting Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)) (brackets in original); Bell v. Cone, 535 U.S. 685, 699 (2002). Rather, under the "unreasonable application" standard, "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable." Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002), cert. denied, sub nom, Neal v. Epps, 537 U.S. 1104 (2003). The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner. Price, 538 U.S. at 641 (quoting Woodford, 537 U.S. at 24-25); Wright v. Quarterman, 470 F.3d 581, 585 (5th Cir. 2006).

## V.    EVIDENCE RELATED TO MURDER (CLAIM NO. 1)

Davis alleges that the state trial court erred in allowing evidence of Officer Russell's murder during Davis's trial for armed robbery in violation of the Sixth and Fourteenth Amendments. He argues that the evidence was not relevant and that its probative value was outweighed by the substantial prejudice to him.

Davis's appointed counsel filed a motion in limine to exclude evidence of Officer Russell's murder, which the trial court denied.[30]  He then raised the issue in an

---

[30]St. Rec. Vol. 7 of 11, Defendant's Motion in Limine, 9/21/07; Transcript, 9/21/07; Transcript, 10/31/07.

application for supervisory writ seeking review of the state trial court's order.[31]   The

appellate court denied the writ application.[32]

Davis's appointed counsel next asserted this claim on direct appeal.[33]   The

Louisiana Fourth Circuit Court of Appeal found no error in the trial court's admission

of the evidence, ruling that evidence concerning the murder of Officer Russell was part

of the res gestae and admissible as integral act evidence under La. Code Evid. art.

404B(1).[34]   It further found that the evidence was highly relevant and that the state trial

court did not abuse its discretion in finding that the probative value of the evidence

relating to the murder of Officer Russell was not clearly outweighed by the danger of

substantial prejudice to Davis under La. Code. Evid. art. 403.[35]   This was the last

reasoned opinion on the issue.   See Ylst v. Nunnemaker, 501 U.S. 797, 802 (1991) (when

the last state court judgment does not indicate whether it is based on procedural default

or the merits of a federal claim, the federal court will presume that the state court has

relied upon the same grounds as the last reasoned state court opinion).

---

[31]St. Rec. Vol. 3 of 11, 4th Cir. Writ Application, 20808-K-12, 1/4/08.

[32]St. Rec. Vol. 3 of 11, 4th Cir. Order, 2008-K-0012, 1/4/08

[33]St. Rec. Vol. 10 of 11, Appeal Brief, 09-KA-438, pp. 3-5, 6/3/09.

[34]Davis, 30 So. 3d at 210; St. Rec. Vol. 10 of 11, 4th Cir. Opinion, 2009-KA-0438, pp. 12-17, 1/13/10.   According to La.Code Evid. art. 404B(1), evidence of other crimes, wrongs, or acts is admissible when "it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding."   This is the codification of the res gestae provision formerly enacted at La. Rev. Stat. §§ 15:447–448.

[35]Davis, 30 So.3d at 210; St. Rec. Vol. 10 of 11, 4th Cir. Opinion, 2009-KA-0438, pp. 17-18, 1/13/10.

To the extent that Davis argues that the evidence was admitted in violation of Louisiana law, that claim is not cognizable on federal habeas review. See Swarthout v. Cooke, 562 U.S. 216, 219 (2011) (federal habeas review does not lie for errors of state law). Habeas corpus review is limited to questions of constitutional dimension, and federal courts generally do not review the admissibility of evidence under state law. Estelle v. McGuire, 502 U.S. 62, 67–68 (1991); Gonzales v. Thaler, 643 F.3d 425, 429 (5th Cir. 2011); Jernigan v. Collins, 980 F.2d 292, 298 (5th Cir.1992).

Thus, federal courts do not sit to review the propriety of state court evidentiary rulings, unless the proceedings violate due process in such a way that the violation renders the criminal proceeding fundamentally unfair. Lisenba v. People of the State of California, 214 U.S. 219, 236–37 (1941). Federal habeas review on such matters is proper only to determine whether a state trial judge's error is so extreme as to render the trial fundamentally unfair or violate an explicit constitutional right. Peters v. Whitley, 942 F.2d 937, 940 (5th Cir. 1991). The Due Process Clause provides a mechanism for relief when evidence is wrongly admitted in a state court criminal proceeding, but only if that evidence is so unduly prejudicial that it renders the trial fundamentally unfair. Bigby v. Dretke, 402 F.3d 551, 563 (5th Cir. 2005). The evidence must have had a substantial, injurious effect or influence in determining the jury's verdict such that it rendered the trial fundamentally unfair. Wood v. Quarterman, 503 F.3d 408, 414 (5th Cir. 2007). Admission of prejudicial evidence is fundamentally unfair so as to justify federal habeas corpus relief only if it "played a crucial, critical, and highly significant

role in the trial." Gonzales v. Thaler, 643 F.3d 425, 430 (5th Cir. 2011) (quotation omitted).

Under these standards, to establish a fundamentally unfair trial, a petitioner must show a reasonable probability that the verdict would have been different had the trial been properly conducted. Kirkpatrick v. Blackburn, 777 F.2d 272, 279 (5th Cir. 1985). A habeas petitioner must show that "the trial court's error had a 'substantial and injurious effect or influence in determining the jury's verdict.'" Hernandez v. Dretke, 125 F. App'x 528, 529 (5th Cir. 2005) (citing Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)).

This claim presents a mixed question of law and fact. Wilkerson v. Cain, 233 F.3d 886, 890 (5th Cir. 2000); Livingston v. Johnson, 107 F.3d 297, 309 (5th Cir. 1997) (admissibility of evidence under the Due Process Clause is a mixed question of law and fact). Thus, the court must determine whether the denial of relief by the state courts was contrary to or an unreasonable application of federal law. Under these rigorous standards, Davis has failed to meet his burden regarding the trial court's admission of this evidence.

Davis argues that the evidence relating to Officer Russell's murder was not part of the res gestae. He further claims that the evidence was irrelevant and that the prejudicial effect of the evidence of Russell's murder outweighed its probative value. The appellate court rejected these claims on appeal. The court found that the evidence of Officer Russell's murder, which occurred as Davis and his accomplices were fleeing the scene of the armed robberies, "was related and intertwined with the charged offenses

to such an extent that the state could not have accurately presented its case without reference to it."[36]  It further found that evidence of the murder was an integral part of the larger chain of criminal activity that included the armed robberies.[37]  The court found that Officer Russell's murder and the subsequent investigation was "integral to the robberies committed by Davis, his apprehension, and his confession" and "therefore highly relevant."[38]   The court discussed the balancing test of probative value and undue prejudice.  It concluded that, considering the evidence against Davis as to the armed robbery counts and the fact that the evidence was that "Davis did not shoot at Officer Russell, but that one of his accomplices did, without evidence of any instigation from Davis to do so," the trial court did not abuse its discretion in implicitly finding the probative value of the evidence of Officer Russell's murder was not clearly outweighed by the danger of substantial prejudice to Davis.[39]

This court's review of the record confirms the relevance of the evidence of Officer Russell's murder and that the probative value of the evidence outweighed the prejudicial effect.  Officer Russell's murder occurred as Davis and his accomplices were attempting to flee the bar after robbing the patrons and was part of the same chain of events as the crimes at issue here.  There is no indication in the state court record that the evidence of

---

[36] Davis, 30 So.3d at 210; St. Rec. Vol. 10 of 11, 4th Cir. Opinion, 2009-KA-0438, p. 17, 1/13/10.

[37] Davis, 30 So.3d at 210; St. Rec. Vol. 10 of 11, 4th Cir. Opinion, 2009-KA-0438, p. 17, 1/13/10.

[38] Davis, 30 So.3d at 211; St. Rec. Vol. 10 of 11, 4th Cir. Opinion, 2009-KA-0438, p. 18, 1/13/10.

[39] Davis, 30 So.3d at 211; St. Rec. Vol. 10 of 11, 4th Cir. Opinion, 2009-KA-0438, p. 18, 1/13/10

Officer Russell's murder misled the jury into an improper verdict. It cannot be said that the evidence played a crucial, critical and highly significant role in Davis's conviction. The testimony was clear that Davis did not shoot Officer Russell; rather one of Davis's accomplices shot him. Further, there was compelling evidence of Davis's guilt of the armed robbery offenses, including (1) the testimony of Ms. Pritchard and Officer Colon, who both identified Davis as one of the robbers; (2) Davis's apprehension near the scene and in close proximity to a firearm, jewelry, cash and several gold dental fillings; (3) a shell casing inside the bar that matched the firearm; and (4) Davis's confession. Under these circumstances, the evidence of Officer Russell's murder did not result in a denial of fundamental fairness. The state courts' denial of relief on this claim was not contrary to nor an unreasonable application of United States Supreme Court precedent. Davis is not entitled to relief as to this claim.

VI.    <u>CONFESSION EVIDENCE (CLAIM NO. 2)</u>

Davis alleges the trial court erred in admitting evidence of his confession because the confession was obtained despite explicit invocation of his right to counsel. Specifically, petitioner contends that although he invoked his right to counsel, the detective continued to question him. Petitioner also contends that his confession was involuntary because he was injured, exhausted and under the influence of pain medication.

Davis's original counsel filed a motion to suppress the recorded custodial confession on the basis that Detective Deal continued to question Davis after he invoked

his right to counsel.[40]   The trial court held an evidentiary hearing on March 28, 2003.[41]

At the hearing, counsel specifically referenced the following statement made by Davis

to Detective Deal during post-arrest questioning of the shooting death of Officer Russell:

"Well, like can I have an attorney ...."[42]   Detective Deal testified that it was his

understanding that Davis was repeating the question that Deal had asked.[43]   At the

conclusion of Detective Deal's testimony, Davis's counsel withdrew the motion.[44]   The

state trial court nonetheless denied the motion to suppress without providing reasons.[45]

Davis's subsequent counsel filed a second motion to suppress the confession on

February 15, 2008.[46]   At a hearing on February 28, 2008, the trial court denied the

motion.[47]   Davis's counsel sought supervisory writs.[48]   The Louisiana Fourth Circuit

Court of Appeal denied relief, finding Davis had "an adequate remedy on appeal."[49]

---

[40]St. Rec. Vol. 1 of 11, 433-891 Docket Master, 2/21/03.

[41]St. Rec. Vol. 4 of 11, Transcript, 3/28/03.

[42]St. Rec. Vol. 4 of 11, Transcript, p. 84, 3/28/03.

[43]St. Rec. Vol. 4 of 11, Transcript, p. 85, 3/28/03.

[44]St. Rec. Vol. 4 of 11, Transcript, p. 93, 3/28/03.

[45]St. Rec. Vol. 4 of 11, Transcript, p. 150, 3/28/03.

[46]St. Rec. Vol. 8 of 11, Motion to Suppress Statement, 2/15/08.

[47]St. Rec. Vol. 4 of 11, Transcript, p.22, 2/28/08.

[48]St. Rec. Vol. 4 of 11, 4th Cir. Writ Application, 2008-K-544, 5/1/08.

[49]St. Rec. Vol. 4 of 11, 4th Cir. Order, 08-K-544, 5/8/08.

On direct appeal, Davis's appellate counsel asserted that it was error for the state trial court to admit the confession.  The Louisiana Fourth Circuit Court of Appeal found no error under state and federal law.  The appellate court, in denying relief, explained:

> the defendant had already been advised of his rights, including his right to remain silent and his right to counsel, and he had already waived them by signing the waiver of rights form before asking about an attorney. Considering the totality of the circumstances—that Davis had waived his rights, the wording and context of Davis's subsequent question about counsel, and Detective Deal's evidentiary hearing testimony concerning that question—that which Davis argues was an "unmistakable" invocation of his right to counsel was in our view in fact ambiguous and equivocal in that a reasonable officer in light of the circumstances would at most have understood only that defendant "might be" invoking his right to counsel, as in Davis, supra.  Therefore, we do not find that the trial court abused its discretion in determining that Davis had not affirmatively and unambiguously invoked his right to counsel, and that the state had established that Davis's statement was free and voluntary and not the result of fear, duress, intimidation, menace, threats, inducements, or promises.

Davis, 30 So. 3d at 216.  State Record Volume 10 of 11, Louisiana Fourth Circuit Court of Appeal Opinion, 2009-KA-0438, p. 28, January 13, 2010.  This was the last reasoned opinion on the issue.

The voluntariness of a confession is a mixed question of law and fact.  Miller v. Fenton, 474 U.S. 104, 112 (1985); ShisInday v. Quarterman, 511 F.3d 514, 522 (5th Cir. 2007) (citing Miller, 474 U.S. at 112).  A federal court on habeas review must respect the state court's determination of voluntariness as long as it was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1); Barnes v. Johnson, 160 F.3d 218, 222 (5th Cir. 1998).  In doing so, a federal habeas court must afford a presumption of correctness to

state courts' findings of fact if they are fairly supported by the record.  Miller, 474 U.S. at 117.  The state court's related factual determinations are presumed to be correct and are overturned only if they were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2); Barnes, 160 F.3d at 222; see also, Miller, 474 U.S. at 117.

Under Miranda v. Arizona, 384 U.S. 436 (1966), a statement made by a person in custody is inadmissible unless that person was informed that he has the right to have an attorney present during questioning, that he has the right to remain silent, and that anything that he says may be used against him.  Id., 384 U.S. at 444-45.  A person may waive these rights so long as the waiver is knowing and voluntary.  Moran v. Burbine, 475 U.S. 412, 421 (1986).  During custodial interrogation, "the right to have counsel present ... is indispensable to the protection of the Fifth Amendment privilege." Miranda, 384 U.S. at 469.  When a suspect declares that he wants an attorney, "the interrogation must cease until an attorney is present."  Id., 384 U.S. at 474; see also, Edwards v. Arizona, 451 U.S. 477, 484 (1981); see also, Maryland v. Shatzer, 559 U.S. 98, 103-04 (2010) (when a suspect asserts his right to counsel, the police must end all questioning until an attorney is available or the suspect reinitiates the interrogation).

For those reasons, a statement made after asserting Miranda rights is presumed involuntary, "even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." McNeil v. Wisconsin, 501 U.S. 171, 177 (1991).  This compels police officers to honor an unambiguous invocation of a

person's rights. Miranda, 384 U.S. at 473-74. Thus, once the right to counsel clearly is invoked, an officer may not make further attempts to elicit statements until the suspect initiates further discussion. Edwards, 451 U.S. at 484-85; Shatzer, 559 U.S. at 103-04.

In Edwards, the Supreme Court clarified that, once the request for counsel is made during questioning, "an accused . . . is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused initiates further communication, exchanges, or conversations with the police." Edwards, 451 U.S. at 484-85. The Edwards rule is "designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights." Michigan v. Harvey, 494 U.S. 344, 350 (1990).

However, ambiguous assertions of the right to counsel are not enough to require police to stop an interrogation. See Barnes, 160 F.3d at 224 (the accused did not invoke the right to counsel in light of his prior statements and his decision to initiate discussions with police after he heard and waived his Miranda rights). The test is whether, viewed objectively, a reasonable police officer in the circumstances would understand the request to be an invocation of the right to a lawyer. Davis v. United States, 512 U.S. 452, 458-59 (1994) (the suspect's statement, "Maybe I should talk to a lawyer," made over ninety minutes into a custodial interrogation, after he previously waived his rights, was an ambiguous assertion of the right to counsel). A court must determine whether the accused "articulate[d] his desire to have counsel present sufficiently clearly that a

reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis, 512 U.S. at 459.

The Supreme Court has expressly declined to "require law enforcement officers to cease all questioning" when a suspect makes an ambiguous or equivocal reference to an attorney. Davis, 512 U.S. at 459-60. Once a suspect validly waives his rights, police questioning may continue until the suspect "clearly requests an attorney." Id., 5122 U.S. at 461. A police officer is not required to ask clarifying questions of the accused, although the Supreme Court has suggested that it may "often be good police practice" to do so. Id.

Thus, an unambiguous statement "that can reasonably be construed to be an expression of a desire for the assistance of an attorney" is required under this stringent standards set forth by the Supreme Court. Id., 512 U.S. at 459. In Davis, the Court established a bright-line rule, under which "a statement either is such an assertion of the right to counsel or it is not." Id. As the United States Fifth Circuit Court of Appeals has declared, a suspect need not "'speak with the discrimination of an Oxford don,' he must nevertheless clearly articulate his desire to have an attorney present." Soffar v. Cockrell, 300 F.3d 588, 595 (5th Cir. 2002) (quoting Davis, 512 U.S. at 459).

Federal courts have long recognized that statements like the one made by Davis do not constitute an unambiguous or unequivocal request for counsel. Martin v. Wainwright, 770 F.2d 918, 924 n. 6 (11th Cir.1985) (statements such as "Can I have a lawyer?" or "Can't I have a lawyer?" are equivocal invocations of the right to counsel),

modified on other grounds, 781 F.2d 185 (11th Cir. 1986).  See United States v. Dixon, No. 8:10–cr–135–T–30MAP, 2010 WL 5209359, at *4 (M.D. Fla. Nov. 18, 2010) (the question "Can I have my lawyer here while we talk?" was ambiguous), report & recommendation adopted, 2010 WL 5209355 (M.D. Fla Dec. 16, 2010), aff'd, 491 F. App'x 120 (11th Cir. 2012) ; Reed v. Quarterman, Civ. Action No. H–07–3189, 2009 WL 2983044, at *11 (S.D. Tex. Sept. 14, 2009) (question to police, "I can get a lawyer if I want one?" was ambiguous and did not require police to stop questioning); United States v. Sharp, No. CR. A. 02cr58-GMS, 2002 WL 31855064, at *4 (D. Del. Dec. 20, 2002) (question to police, "I can have a lawyer here?" was ambiguous and no reasonable officer would have construed it as a request for counsel); Robinson v. Stegall, 157 F.Supp.2d 802, 818-19 (E.D. Mich. 2001) ("[c]an I get a lawyer in here right now?" was not an unequivocal request for counsel).  Thus, Detective Deal was permitted to continue with the interrogation.  Nonetheless, Deal clarified whether Davis wanted to continue giving a statement.[50]  Deal began questioning Davis about the crime only after Davis again confirmed that he understood his rights and wanted to give a statement.[51]

Davis did not make a clear request for counsel.  He has not established that he intended at that time to invoke his right to counsel or to distinguish his statement from those statements referenced in the above-cited cases, all of which were found ambiguous and equivocal.  This was not a clear and unequivocal request to have counsel before

---

[50]St. Rec. Vol 4 of 11, Transcript of Excerpt of Davis's Statement, p. 5, ll.11-24, 8/4/02.

[51]St. Rec. Vol 4 of 11, Transcript of Excerpt of Davis's Statement, p. 5, ll.14-28, 8/4/02.

continuing to answer questions.  The statement was not so clear that a reasonable police officer would have deemed it a request for counsel as required under <u>Miranda</u> and <u>Edwards</u>.

Davis next maintains his waiver was not knowing or intelligent because he was injured, exhausted and medicated.  Davis contends he had been bitten on the head and arm by a K-9 dog and had been given pain medication at the hospital before being questioned.

An individual may waive his right against self-incrimination, if done so "voluntarily, knowingly and intelligently."  <u>Miranda</u>, 384 U.S. at 444.  Two relevant inquiries determine whether an accused has voluntarily and knowingly waived his Fifth Amendment privilege against self-incrimination.  <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986); <u>Soffar</u>, 300 F.3d at 592.  First, a waiver of the right must be voluntary and not the product of intimidation, coercion or deception.  <u>Moran</u>, 475 U.S. at 421. Second, the waiver or relinquishment must be made with full awareness of the nature of the right being waived. <u>Id.</u>  In making these inquiries, the court must consider the "totality of all the surrounding circumstances-both the characteristics of the accused and the details of the interrogation."  <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973).  Although mental state or condition may be a significant factor in the voluntariness determination, "this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'"  <u>Carter v. Johnson</u>, 131 F.3d 452, 462 (5th Cir. 1997)

(citing <u>Colorado v. Connelly</u>, 479 U.S. 157, 164 (1986)).  Thus, coercive police conduct is a necessary prerequisite to a conclusion that a confession was involuntary, and the defendant must establish a causal link between the coercive conduct and the confession. <u>Carter</u>, 131 F.3d at 462 (citing <u>Connelly</u>, 479 U.S. at 163-67).

The record in this case demonstrates that none of the factors mentioned by Davis impeded his ability to make a knowing, intelligent and voluntary waiver of his rights. Davis expressed that his rights had been read to him and that he had signed the rights of arrestee or suspect form of his own free will.[52]  He stated that he understood his rights and that he wanted to give a statement.[53]   At no time did he give any indication that he did not understand those rights. There is no evidence of threats, undue influence, pressure or promises of leniency. In sum, Davis's verbal and express written confirmation that he understood his <u>Miranda</u> rights along with his willingness to be interviewed, establish that he made a knowing, intelligent, and voluntary waiver of his <u>Miranda</u> rights.

Davis has failed to demonstrate that his statement was obtained in violation of his constitutional rights. Davis has not established that the state court's decision was contrary to or an unreasonable application of federal law.  He is not entitled to relief on this issue.

---

[52]St. Rec. Vol. 4 of 11, Transcript of Excerpt of Davis's Statement, p. 4, 8/4/02.

[53]St. Rec. Vol. 4 of 11, Transcript of Excerpt of Davis's Statement, p. 5, 8/4/02.

VII.    EFFECTIVE ASSISTANCE OF COUNSEL MOTION TO QUASH (CLAIM NO. 3)

Davis claims that his counsel rendered constitutionally deficient assistance in failing to file a motion to quash based on the untimely institution of armed robbery charges and the commencement of trial on those charges.

In July 2006, Armstrong, Davis's co-defendant, filed a motion to dismiss the armed robbery charges in which he argued that the statutory time limit for instituting the armed robbery charges and for trial to commence on the charges had lapsed.[54]  Armstrong filed an application for a writ of mandamus and/or supervisory writs.[55]  The Louisiana Fourth Circuit Court of Appeal denied the writ finding, "Relator is not currently entitled to relief on the claims raised in his motion to dismiss because the institution of prosecution is timely pursuant to La. C.Cr.P. art. 572."[56]  On December 20, 2006, petitioner filed an application for supervisory writs alleging that the state trial court had failed to rule on his motion to quash and also filed a motion for bill of particulars.[57]  The Louisiana Fourth Circuit Court of Appeal found that the docket master failed to show that Davis had filed a motion to quash in the state trial court and that there was nothing for the court to transfer or review.[58]  The appellate court transferred to the state trial court

---

[54]St. Rec. Vol. 2 of 11, Armstrong's Motion to Dismiss, 7/16/06 (dated 7/03/06).

[55]St. Rec. Vol. 2 of 11, Armstrong's 4th Cir. Writ Application, 06-K-0930, 7/17/06.

[56]St. Rec. Vol. 2. of 11, 4th Cir. Order, 06-K-0930, 7/31/06.

[57]St. Rec. Vol. 2 of 11, 4th Cir. Writ Application, 2006-K-1637, 12/20/2006; Motion for Bill of Particulars (dated 12/13/06).

[58]St. Rec. Vol. 2 of 11, 4th Cir. Order, 2006-K1637, 1/31/07.

Davis's motion for bill of particulars.[59]  On May 6, 2008, Davis filed another application for supervisory writs raising the same issues.[60]  The Louisiana Fourth Circuit Court of Appeal did not entertain the application because Davis's appeal was pending.[61]

Davis resurrected the claim in his application for post-conviction relief albeit in the form of a claim of ineffective assistance of counsel.[62]  The state trial court summarily denied the claim.[63]  The appellate court denied Davis's writ application without stated reasons.[64]  The Louisiana Supreme Court found that Davis had failed to show he received ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 688 (1984).[65]  This was the last reasoned opinion of the state courts.

The issue of ineffective assistance of counsel is a mixed question of law and fact. Clark v. Thaler, 673 F.3d 410, 416 (5th Cir.2012); Woodfox v. Cain, 609 F.3d 774, 789 (5th Cir.2010).  Thus, the question before this court is whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

---

[59]St. Rec. Vol. 2 of 11, 4th Cir. Order, 2006-K1637, 1/31/07.

[60]St. Rec. Vol. 5 of 11, 4th Cir. Writ Application, 2008-K-564, 5/6/08.

[61]St. Rec. Vol. 5 of 11, 4th Cir. Order, 2008-K-0564, 6/17/08.

[62]St. Rec. Vol. 11 of 11, Application for Post-Conviction Relief, 9/17/11 (dated 9/7/11).

[63]St. Rec. Vol. 1 of 11, Minute Entry, 5/6/13.

[64]St. Rec. Vol. 11 of 11, 4th Cir. Order, 2014-K-1343, 12/17/14; 4th Cir. Writ Application, 2014-K-1343, 12/8/14.

[65]State ex rel. Davis, 182 So. 3d at 32; St. Rec. Vol. 11 of 11, La. Supreme Ct. Order, 2015-KH-0138, 11/6/15.

The standard for judging performance of counsel was established by the United States Supreme Court in Strickland, in which the Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel, requiring petitioner to prove both deficient performance and resulting prejudice. Id., 466 U.S. at 697. The Supreme Court first held that "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 687-88. Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694; United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999).

In deciding ineffective assistance of counsel claims, this court need not address both prongs of the conjunctive Strickland standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. Kimler, 167 F.3d at 893. A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.' ... But it is not enough under Strickland, 'that the errors had some conceivable effect on the outcome of the proceeding.'" (citation omitted) Motley v. Collins, 18 F.3d 1223, 1226 (5th Cir. 1994) (quoting Strickland, 466 U.S. at 693); Harrington v. Richter, 562 U.S. 86, 112 (2011) (Strickland requires a "substantial" likelihood of a different result, not just "conceivable" one.)

On habeas review, the United States Supreme Court has clarified that, under Strickland, "[t]he question is whether an attorney's representation amounted to

incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." Harrington, 562 U.S. at 105. The Harrington Court went on to recognize the high level of deference owed to a state court's findings under Strickland in light of the AEDPA:

> The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is doubly so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Harrington, 562 U.S. at 105.

Thus, scrutiny of counsel's performance under § 2254(d) is "doubly deferential." Cullen v. Pinholster, 563 U.S. 170, 190 (2011) (quoting Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)). This court must therefore apply the "strong presumption" that counsel's strategy and defense tactics fall "within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 690.

Federal habeas courts presume that litigation strategy is objectively reasonable unless clearly proven otherwise by the petitioner. Id., 466 U.S. at 689; Geiger v. Cain, 540 F.3d 303, 309 (5th Cir. 2008); Moore v. Johnson, 194 F.3d 586, 591 (5th Cir. 1999). In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time

of trial. Strickland, 466 U.S. at 689; Neal v. Puckett, 286 F.3d 230, 236-37 (5th Cir. 2002); Clark v. Johnson, 227 F.3d 273, 282-83 (5th Cir. 2000), cert. denied, 531 U.S. 1167 (2001). Tactical decisions when supported by the circumstances are objectively reasonable and do not amount to unconstitutionally deficient performance.  Lamb v. Johnson, 179 F.3d 352, 358 (5th Cir. 1999), cert. denied, 528 U.S. 1013 (1999) (citing Rector v. Johnson, 120 F.3d 551, 564 (5th Cir. 1997) and Mann v. Scott, 41 F.3d 968, 983-84 (5th Cir. 1994)).

Davis first asserts that his trial counsel was ineffective in failing to file a motion to quash on the basis that the institution of armed robbery charges was untimely under Louisiana law.  In assessing counsel's performance under Strickland, the court must consider Louisiana's requirements for timely prosecution.

Louisiana Code Crim. P. art. 572(A)(1) allows the State six years from the date of the offense—August 4, 2002—to institute charges against petitioner.  The original single charge of first degree murder was filed October 10, 2002, two months after the date of the offense.  The bill of information charging four counts of armed robbery was filed on February 23, 2005, less than four years after the date of the offense and well within six year period prescribed by La. Code Crim. P. art. 572(A)(1).  As the institution of prosecution against petitioner was timely under Louisiana law, Davis's counsel had no basis on which to file a motion to quash.

Counsel cannot be ineffective for failing to pursue a futile course of action.  See Lindsey v. Cain, 267 F. App'x. 374, at * 1 (5th Cir. 2008) (per curiam) (counsel is not ineffective by failing to raise frivolous or futile claims) (citing Johnson v. Cockrell, 306 F.3d 249, 255 (5th Cir. 2002)).  Thus, Davis's assertion that his counsel was ineffective in failing to file a motion to quash based on the untimely institution of prosecution is without merit.

Davis next asserts that his trial counsel was ineffective in failing to file a motion to quash on the basis that the trial was untimely under Louisiana law.  The prosecution of this case was instituted by the filing of a bill of information on or about February 23, 2005.  State v. Watts, 738 So. 2d 628, 629 (La. App. 5th Cir. 1999) (The date of institution of prosecution is the date when the indictment is returned or the bill of information is filed.") (citing State v. Gladden, 257 So. 2d 388 (1972), cert. denied, 410 U.S. 920 (1973)).  Therefore, under La. Code Crim. P. art. 578(A)(2), the State would normally have been required to bring petitioner to trial within two years.  However, Louisiana law further provides that the limitations period set forth in Article 578 is interrupted if "[t]he defendant cannot be tried ... for any ... cause beyond the control of the state" and that limitations period then "run[s] anew from the date the cause of interruption no longer exists."  La. Code Crim. P. art. 579.

In this case, the limitations period was interrupted by Hurricane Katrina, which Louisiana courts have repeatedly held was a "cause beyond the control of the state"

within the meaning of Article 579.  In such cases, the limitations period began to run anew from June 5, 2006.  State v. Patin, 95 So. 3d 542, 552–53 (La. App. 4th Cir. 2012); State v. Williams, 5 So. 3d 904 (La. App. 4th Cir. 2009); State v. Francis, 977 So.2d 187, 192 (La. App. 4th Cir .2008).  Therefore, the state had an additional two years from that date, i.e. until June 5, 2008, to commence petitioner's trial.  Williams, 5 So. 3d at 905. Because Davis was brought to trial on May 12, 2008, the trial was timely and a motion to quash would have had no merit.

The record supports the state courts' finding that Davis failed to establish that he was denied effective assistance of counsel. The state court's denial of relief was not contrary to nor an unreasonable application of Strickland.  He is not entitled to relief on this issue.

## VIII.  FULL AND FAIR RECORD (CLAIM NO. 4)

Petitioner claims he was denied a full and fair record in violation of his due process rights because the voir dire transcript does not include peremptory challenges made by defense counsel or the state trial court's rulings on challenges for cause in violation of State v. Pinion, 968 So. 2d 131 (La. 2007) (per curiam)[66] and La. Code Crim. P. arts. 795 and 843.

---

[66]In Pinion, the Louisiana Supreme Court found that bench conferences are a material part of the proceedings and the omission of the bench conference during which challenges for cause and peremptory challenges were made required reversal of the defendant's conviction and sentence where it was reasonably likely that defense counsel had exhausted his peremptory challenges and it was uncertain how many cause challenges the defense made unsuccessfully and there was no other record accounting for the jury selection process. Id., at 968 So. 2d at 136.

Davis asserted this claim in his application for post-conviction relief.[67]  The state trial court and appellate court denied the claim without stated reasons.[68]  The Louisiana Supreme Court, relying on Pinion, found that petitioner failed to show that he suffered any prejudice.[69]  This was the last reasoned decision of the state courts on this issue.

To the extent Davis argues this issue as a violation of state law, his claim must fail. As previously discussed, federal habeas review may only consider constitutional violations and noncompliance with federal law as interpreted by the United States Supreme Court.  See Swarthout, 562 U.S. at 219.  The court cannot provide habeas relief based on Pinion.  Hedgesperth v. Warden, Louisiana State Penetentiary, Civ. Action No. 11–cv–2078, 2015 WL 1089325, at *6 (W.D. La. Mar. 5, 2015); Greer v. Warden, Louisiana State Penetentiary, Civ. Action. No. 11–cv–1727, 2014 WL 4387295, at *9 (W.D. La. Mar. 15. 2015).

Davis states that the failure to include the bench conferences violated his right to due process.  In this respect, he asserts a claim for federal habeas review, see Griffin v. Illinois, 351 U.S. 12, 19–21 (1956).  Davis claims the incomplete trial transcript denied him complete appellate review.  It is true that a criminal defendant has the right to

---

[67]St. Rec. Vol. 11 of 11, Application for Post-Conviction Relief, 9/17/11 (dated 9/7/11).

[68]St. Rec. Vol. 1 of 11, Minute Entry, 5/6/13; St. Rec. Vol. 11 of 11, 4th Cir. Order, 2014-K-1343, 12/17/14.

[69]State ex rel. Davis, 182 So. 3d at 32; St. Rec. Vol. 11 of 11, La. Supreme Ct. Order, 15-KH-0138, 11/6/15.

adequate appellate and other review of his conviction based upon a sufficiently complete and accurate record.  Mayer v. City of Chicago, 404 U.S. 189, 198 (1971).  However, the Supreme Court has not held that due process requires a verbatim transcript of the entire proceedings or that an incomplete record confers automatic entitlement to relief.  To prevail on a claim that the record was inadequate, a petitioner must prove that the missing portion of the transcript actually prejudiced his appeal in some manner.  Green v. Johnson, 160 F.3d 1029, 1045 (5th Cir.1998) ("[B]arring a showing that the [failure to record bench conferences during trial] resulted in 'actual prejudice,' habeas relief is unwarranted." (citation omitted)); see also Mullen v. Blackburn, 808 F.2d 1143, 1146 (5th Cir.1987) (petitioner failed to show the absence of voir dire transcript prejudiced his appeal); Bozeman v. Cain, Civ. Action No. 09–8423, 2010 WL 2977393, at *4 (E.D. La. June 7, 2010), report & recommendation adopted, 2010 WL 2977402 (E.D. La. July 20, 2010) (petitioner's claim failed when there was no actual prejudice resulting from the failure to transcript a bench conference).

Petitioner has made no such showing in this case.  On the contrary, the record was adequate for resolution of the claims that were actually asserted on appeal.  Where, as here, the missing portions of the transcript were immaterial to the claims asserted on appeal, the record was adequate for full appellate review and there was no denial of a meaningful appeal.  See Schwander v. Blackburn, 750 F.2d 494, 497–98 (5th Cir.1985) (petitioner was not denied a meaningful appeal where the omitted potions of the trial

transcript were immaterial to the error alleged on direct appeal); <u>Thomas v. Cain</u>, Civ. Action No. 12–2818, 2013 WL 5960808, at *5 (E.D. La. Nov. 6, 2013) (record was adequate for resolution of appellate claims).

Davis claims that the lack of a complete transcript prevented him from raising erroneous denials of his challenges for cause to jurors that he was then forced to strike peremptorily. He speculates that his counsel likely exhausted his peremptory challenges before the alternate jurors had been selected. He also claims that several bench conferences and sidebars that were unrecorded were a result of objections to the admission of prejudicial evidence or argument. However, he fails to show the existence of any particular ruling he would like to challenge. Essentially, he is requesting a more complete record in order to find potential constitutional errors, not to support specific errors he has already clearly identified. As such, he has not met his burden to prove that relief is warranted. <u>See, e.g.,</u> <u>Johnson v. Cooper</u>, Civ Action No. 12–2818, 2013 WL 4548526, at *8 (E.D. La. Aug. 27, 2013) ("Without a specific issue or ruling that is contained in the bench transcript to appeal, his claim lacks a relevant issue that would trigger a duty upon the State to provide him the transcript.").

The Louisiana Supreme Court rejected Davis's claim, relying on Louisiana precedent, but reaching a conclusion in accord with federal law. This decision was neither contrary to, nor an unreasonable application of, Supreme Court precedent. Davis is not entitled to federal habeas corpus relief on this claim.

## RECOMMENDATION

For the foregoing reasons, it is **RECOMMENDED** that Davis's petition for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[70]

New Orleans, Louisiana, this ___3rd___ day of May, 2017.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[70]Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.